Filed 3/8/24  In re Z.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re Z.P. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,  Plaintiff and Respondent,  v.  K.M.,  Defendant and Appellant. | E081177  (Super.Ct.No. DPSW2300101)  OPINION |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

K.M. (father) appeals from an order of the juvenile court finding that he possessed firearms in violation of a restraining order. He contends the court misunderstood the law as prohibiting access to firearms, when the law only prohibits possession or ownership of firearms. He also argues the evidence was insufficient to show he possessed firearms at the time the restraining order was in effect. We affirm.

PROCEDURAL BACKGROUND

On April 4, 2023, the Riverside County Department of Public Social Services (DPSS) filed a Welfare and Institutions Code[1] section 300 petition with regard to 15-year-old Z.T.P., 11-year-old Z.L.P., and 5-year-old K.S.M. (the children). The petition stated that R.S. (mother) was the children's mother, father was K.S.M.'s father, and the father of Z.T.P. and Z.L.P. was deceased. The petition alleged that the children came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (j) (abuse of sibling). The specific allegations included claims that father abused Z.T.P. by choking him and slamming him against a wall; father and mother had a history of domestic violence; and father had a history of exhibiting volatile behavior and administering inappropriate discipline on the children, including hitting them with a belt and choking them.

The social worker filed a detention report stating that, on March 30, 2023, DPSS received a referral alleging physical and emotional abuse and general neglect. The

_____

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

2

referral alleged that, on March 28, 2023, father and Z.T.P. got into an argument, Z.T.P. raised his voice, and father responded by slamming him to the ground and choking him. Mother was able to separate them, and Z.T.P. ran into his bedroom; however, father later went to the bedroom and began choking him again. Z.T.P. escaped from the house, mother followed him, and they stayed in a hotel that night. The next day, mother went home, and father saw her in the car. He began banging on the car, so mother drove away and contacted the police. When she returned to the home, father was leaving with K.M.

Mother obtained an emergency protective order (EPO), which she showed to the social worker and said she planned on getting a permanent restraining order. Mother said she did not ever plan on letting father back into the house, and she changed the locks on the front door. She reported that, in 2018, father was arrested for domestic violence, and he had a history of abusing the children he had with other women. Mother further reported that she and father had a history of domestic violence, and he had pushed her against the wall and choked her before.

On March 31, 2023, mother informed the social worker that father returned to the home in the middle of the night and was banging on the front door, but she did not allow him in the home. She called 911, and father fled before the police arrived.

The social worker contacted father and interviewed him. Father denied denied any form of discipline with Z.T.P. or Z.L.P. and denied any domestic violence history. He also denied that he went to the home on March 31, 2023. On April 1, K.M. was removed from father's care without issue.

3

The court held a detention hearing on April 5, 2023. County counsel recommended the court find that the children came within the provisions of section 300, detain them, and set a jurisdiction/disposition hearing. Mother's counsel requested that mother retain custody of the children, noting she did obtain an EPO and filed for a restraining order. Father submitted on the recommended findings. The court found that Z.T.P. came within section 300, subdivisions (a) and (b), and Z.L.P. and K.M. came within subdivisions (b) and (j). The court detained them in foster care.

With regard to a restraining order, the court asked mother if father owned or had access to any firearms, parts of firearms, or ammunition. Mother said, "yes," and said, "They're with him." She said Z.L.P. told her she saw father take a gun from his car when they were at the pumpkin patch. Father denied that he owned, possessed, or had access to any firearms or ammunition. The court stated it was not going to question Z.L.P. in open court, and it ordered the social worker to interview her regarding the firearms she saw. The court then stated it was going to make the finding that father owned, possessed, or had access to a firearm, "description unknown," and that it was going to call it a "ghost gun because it's not registered to the father." The court noted it had reviewed father's CLETS (California Law Enforcement Telecommunications System) report, and father had no firearms registered to him. The court also acknowledged that father denied firearm ownership.

The court issued a temporary restraining order (TRO) protecting mother and the children. The TRO included the terms that: (1) father could not "own, possess, have, buy or try to buy, or receive, try to receive, or in any other way get any" firearms or

4

firearm parts; (2) within 24 hours of receiving the order, father was required to "sell to or store with a licensed gun dealer or turn in to a law enforcement agency any prohibited items [he had in his] immediate possession or control"; and (3) within 48 hours of receiving the order, father was required to "file a receipt with the Court that proves that all prohibited items have been turned in, sold, or stored." The court then stated: "The Court does find that you have the following prohibited items: ghost gun, with unknown description. Location, unknown."

Father's counsel asked, "Is that being ordered 48 hours from today?" The court responded, "If he possesses it, yes. . . . And, of course, right now he's not acknowledging possession of the firearm." The court said it was going to set a hearing in 10 days on the firearm issue since there was "conflicting information." It then set the hearing for April 13, 2023, and ordered DPSS to prepare a report of the interview with Z.L.P. on the statements she made. The court ordered father to move out of the family's home immediately. It also set a hearing regarding a permanent restraining order and the jurisdiction hearing for May 10, 2023.

*Interview with Z.L.P. Regarding Firearms*

The social worker met with Z.L.P. on April 10, 2023, and Z.L.P. said she was aware that father had two guns, which she referred to as pistols. She indicated that she came across one of the pistols in the glove compartment in his car. She could not recall exactly when she saw the pistol but said it was " 'months ago.' " Z.L.P. stated that, since then, the pistols have been in lockboxes, which father kept in the trunk of his car. Z.L.P. denied telling anyone about the pistols until the police arrived at mother's home,

5

regarding the incident between Z.L.P. and father.  At that time, Z.L.P. made mother aware of the pistols.

*Firearms Hearing*

On April 13, 2023, the court held a hearing, and father's counsel requested the matter be trailed to the next day, since Z.L.P. was not present and he wanted to cross-examine her.  The court agreed and trailed the matter.

At the outset of the hearing on April 14, 2023, the court confirmed the parties received the report it had received regarding the information on father's possession of firearms.  Then Z.L.P. testified, and the court first confirmed that she was 11 years old and understood the difference between the truth and a lie.  Z.L.P. initially testified that the first time she saw father with a gun was when they came back from the pumpkin patch.  However, upon further questioning, she said it was maybe around one year ago.  The gun was in the glove compartment of his car, and father put it in a lockbox.  Z.L.P. said the gun was black and looked like a pistol.  She said she saw him put it in the lockbox, and he took the lockbox from the car into the home.  Z.L.P. said the lockbox was on top of the closet.  When asked if she ever saw that gun again later, she said she saw one that looked exactly like it.  Z.L.P. testified that, approximately five months prior to the hearing, she saw a gun in his glove compartment.  Father had asked her to get his slippers, and she accidently hit and opened the glove compartment and saw a black pistol.  Z.L.P. said she also saw father putting together a gold gun in the living room.  She did not know what he did with that gun.  When asked if she knew where the guns were currently located, she said, "I think they're inside a lockbox still."

The court then asked Z.L.P. a few questions, and she said the last time she saw the lockbox, it was in the closet at the house where she was living before she went to foster care; however, it was not there anymore. Z.L.P. said father took the lockbox with him when he left the house. The court asked if father left the house on the same day she and the other children were taken away, and she said no, it was the day mother called the police.[2] The court then asked if the gold gun was a pistol, and she said it was. The court asked if the gun had a clip that pushed into the handle of the gun. Z.L.P. said, "Is it a rectangle?" When the court confirmed it was "kind of a long rectangle," she said, "yes." When the court asked if both guns had a clip, Z.L.P. said, "I didn't see when he assembled the black one, all I saw was the gold one." She then confirmed that the gold gun definitely had a clip, and that both guns fit in one's hand.

Father's counsel cross-examined Z.L.P. and asked when she saw the gold gun in the living room, and she said she could not remember exactly. However, she confirmed she saw the other guns about five months prior. Z.L.P. confirmed that she had not seen any gun in the past five months. The court then asked questions to clarify when she last saw the guns, and she said she saw the black pistol sometime between Christmas and Valentine's Day. Z.L.P. said she only saw the gold gun once, when father was putting it together in the living room, and that was some time after Christmas.

The court then asked if the parties had any additional evidence on the issue of the guns. K.M.'s counsel said she was submitting on the court finding father owned

---

[2] Z.L.P. appeared to be referring to March 31, 2023.

firearms. Father's counsel stated for the record that when father was previously asked if he had firearms, he stated under oath that he did not have possession or access to any firearms. Father's counsel then argued the court should find that father did not currently possess a firearm and was not in any way trying to receive a firearm. Father's counsel further contended "the standard of 'access to' is not the proper standard in which we would proceed under," but the standard was possession. Counsel again asked that, based on Z.L.P.'s testimony and father's comments, the court find father was not currently in possession of a firearm.

The court stated that the evidence could not have been much more compelling, and that Z.L.P. was "truly credible." It noted that she shared similar information with mother, and that the time period when Z.L.P. saw the firearms was "of recent origin." The court next stated: "I don't find the father's testimony convincing or compelling. He certainly could provide evidence if he no longer has these firearms as to what he did with the firearms, but a general denial is certainly not helping him in this setting." It then stated its finding that father "owns, possesses, or has access to firearms or parts of firearms or ammunition." The court emphasized that the compelling part was that father had not complied with its order to divest himself of the firearms and provide a receipt within the time period specified in the TRO. The court then completed and filed the form indicating father had firearms and was not in compliance with its April 5, 2023 order to surrender them, and that the court had not received any receipts or proof of compliance.

8

DISCUSSION

Substantial Evidence Supports the Court's Finding That Father Was Not in Compliance

with the TRO with Regard To Surrendering His Firearms

Father argues the court erroneously found he violated the firearms restriction order since it found he owned, possessed, or had access to firearms, but there was no evidence of "current possession while the protective order was in effect." He specifically contends the court misunderstood the law as prohibiting *access* to firearms, when it only prohibits possession or ownership of firearms. Father emphasizes that the court found he had "access to" firearms in the past, and "the evidence it used for its finding was an assumption that he had continued access to firearms." He also claims he did not need to "prove the absence of possession," when there was no evidence he currently possessed a firearm. Father contends the testimony of a child that he was holding guns five months prior to the issuance of the TRO was insufficient to prove possession while the protective order was in effect. We conclude the court properly found that father violated the TRO.

A. *Relevant Law*

After a dependency petition has been filed, the juvenile court has exclusive jurisdiction to issue restraining orders protecting the children who are the subject of the petition. (§ 213.5, subd. (a); Cal. Rules of Court, rules 5.620(b), 5.630(a).) The court may also issue a restraining order protecting the children's parent. (§ 213.5, subd. (a).) Restraining orders issued by the juvenile court prohibit the restrained party from owning, possessing, purchasing, or receiving a firearm or ammunition during the term of the order. (§ 213.5, subd. (g); Fam. Code, § 6389, subds. (a).) When the court issues the

9

restraining order, it must determine "whether the restrained person is in possession or control of a firearm or ammunition, as provided in Section 6322.5 of the Family Code." (§ 213.5, subd. (g).) "Upon issuance of a protective order, as defined in Section 6218, the court shall order the respondent to relinquish any firearm . . . in the respondent's immediate possession or control or subject to the respondent's immediate possession or control." (§ 6389, subd. (c)(1).) The officer serving the protective order shall request that the firearm be immediately surrendered. (§ 6389, subd. (c)(2).) If the officer does not make such request, "the relinquishment shall occur within 24 hours of being served with the order, by either surrendering the firearm or ammunition in a safe manner to the control of local law enforcement officials, or by selling, transferring, or relinquishing for storage pursuant to Section 29830 of the Penal Code, the firearm or ammunition to a licensed gun dealer . . . ." (§ 6389, subd. (c)(2).)

A person ordered to relinquish a firearm "shall, within 48 hours after being served with the order," file with the court that issued the protective order the receipt showing the firearm was surrendered to a local law enforcement agency or sold to a licensed gun dealer. (§ 6389, subd. (c)(2)(A).) "Failure to timely file a receipt shall constitute a violation of the protective order." (*Ibid.*)

When relevant information is presented to the court at a noticed hearing that a restrained person has a firearm, the court shall determine, by a preponderance of the evidence, whether that person has a firearm "in, or subject to, their immediate possession or control in violation of Section 6389." (§ 6322.5, subd. (a).) In making such determination, the court may consider whether the restrained person filed a firearm

10

relinquishment or sales receipt. (§ 6322.5, subd. (b)(1).) The court may make the determination when the domestic violence protective order is issued, or at a subsequent hearing while the order remains in effect. (§ 6322.5, subd. (b)(2).)

We review the juvenile court's factual findings for substantial evidence. (*In re Carlos H.* (2016) 5 Cal.App.5th 861, 866.) We view the evidence in the light most favorable to the prevailing party "and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination." (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

B. *There Was Substantial Evidence of Current Possession and No Evidence That Father Relinquished the Firearms*

Father essentially claims there was no evidence he possessed a firearm during the 10 days the TRO prohibited him from doing so, since Z.L.P.'s testimony was that she saw him with guns five months prior to the hearing. However, substantial evidence supports the court's determination that he had firearms in or subject to his possession or control at the time of the hearing on the firearms issue. (§ 6322.5, subd. (a).)

On April 5, 2023, the court found father "own[ed], possess[ed], or ha[d] access to" firearms and issued the TRO with the firearms restrictions. The terms of the TRO required him to relinquish his firearms and, within 48 hours of the order, file with the court the receipt showing the firearms were surrendered to the local law enforcement agency or sold to a licensed gun dealer. (§ 6389, subd. (c)(2)(A).) At the subsequent hearing on April 14, 2023, Z.L.P. testified that she saw a black pistol in the glove

11

compartment of father's car and saw him put it in a lockbox. She said he took the lockbox into their home, and it was in the closet. Z.L.P. also testified that she saw father putting together a gold gun in the living room. When asked if she knew where the guns currently were, she said, "I think they're inside a lockbox still." Z.L.P. further testified that father took the lockbox with him when he left the house on the day mother called the police (March 31, 2023)—approximately two weeks prior to the hearing.

At the firearms hearing, the court was required to determine, by only a preponderance of the evidence, whether father had a firearm "in, or subject to, [his] immediate possession or control . . . ." (§ 6322.5, subds. (a), (b)(2).) Z.L.P.'s testimony provided substantial evidence for the court to determine that father was in current possession of firearms, and the court found her to be very credible. Contrary to father's claim that there was no evidence he currently possessed a firearm, the evidence indicated, at least by a preponderance of the evidence, that he took the lockbox with the firearms inside with him when he left the house on March 31, 2023. Thus, the court reasonably inferred that father still had the firearms in his possession or control at the time of the hearing two weeks later. Although father had denied owning or possessing firearms at the prior hearing, the court did not, and was not required to, believe him. (*In re William C.* (1977) 70 Cal.App.3d 570, 579 [the court judges the credibility of witnesses, resolve conflicts in the testimony, weighs the evidence, and draw factual inferences].) Therefore, the evidence before the court indicated that father had current possession of the firearms, and there was nothing presented to counter that evidence.

Further, the court properly considered whether father filed a firearm relinquishment or sales receipt. (§ 6322.5, subd. (b)(1).) He did not file the required receipt, and his failure to timely file proof that he relinquished the firearms constituted a violation of the TRO. (§ 6389, subd. (c)(2)(A).) Accordingly, the court stressed that "the compelling part" was that father had not complied with its order to divest himself of the firearms and provide receipts within the time period specified in the TRO. In other words, in the absence of any evidence that father had relinquished possession or control of the firearms, the evidence was sufficient for the court to find that he still had firearms in his possession or control.

Father focuses on the court's finding that *had access to* firearms and argues that the court misunderstood Family Code section 6322.5 as including "access to" firearms. To the extent father is claiming the court's order that he violated the TRO should be reversed because the court only found that he had access to firearms, rather than current possession, we disagree. The court stated: "I do find that he *owns*, *possesses*, or has access to firearms or parts of firearms or ammunition." (Emphasis added.) As explained *ante*, it found father in violation because there was evidence of current possession, and "he ha[d] not complied with the Court's order to divest himself of the firearms and provide receipts within the time period specified in the temporary restraining order."

Father additionally asserts that "the court suggested [he] could have testified about whether he currently possessed any firearms," and that "the court could not force him to testify against himself." However, the record reflects the court simply did not find father's general denial of possession credible, and it noted he "could provide evidence if

13

he no longer has these firearms as to what he did with the firearms." In contrast to father's assertions, the court appeared to be referring to his failure to file "the receipt showing the firearm . . . was surrendered to a local law enforcement agency or sold to a licensed gun dealer." (§ 6389, subd. (c)(2)(A).) Again, "[f]ailure to timely file a receipt shall constitute a violation of the protective order." (*Ibid*.) Moreover, father waived any privilege against self-incrimination he may have had once he chose to testify in the proceedings. (See *People v. Ing* (1967) 65 Cal. 2d. 603, 610-611; see also *People v. Harris* (1992) 8 Cal. App.4th 104, 108).

Viewing the evidence in the light most favorable to the court's order, as we must, we conclude there was substantial evidence to support the court's finding that father was in violation of the TRO.

DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:


MILLER
          Acting P.J.


CODRINGTON
          J.